Arnold L. Fein, J.
Plaintiff, assignee for the benefit of creditors of Gotham Builders Supply Corp., (Gotham), sues to recover $10,189.35, .the agreed purchase price of construction materials ¡sold and delivered by Gotham to defendant and counterclaim plaintiff, Sal-Vio Masons, Inc. (Sal-Vio). Sal-Vio counterclaims for money damages in the sum of $24,024.57 allegedly stemming from the failure of Gotham to supply masonry materials in ¡accordance with two written agreements between Gotham and Sal-Vio.
The case has been submitted upon an agreed statement of facts (CPLR 3031) together with exhibits. Prior to the execution of the subject agreements, Sal-Vio entered into a series of agreements with Community Services Inc. (a general contractor) to provide and install the brick masonry required for the construction of approximately one half of the buildings comprising “ Co-op City ”, a large residential project.
To secure a committed and continuous supply of masonry materials at fixed prices, Sal-Vio entered into the subject written agreements with Gotham, dated May 26, 1966 and August 27,1966, under which Gotham agreed to sell and Sal-Vio agreed to purchase all masonry materials required by Sal-Vio, ¡specified in the agreements. Gotham also agreed to store certain quanti *730 ties of gypsum Mock for the exclusive use of Sal-Vio and another masonry contractor not involved in this action.
Gotham obtained its masonry materials from various manufacturers, except that its exclusive supplier of gypsum block was United States Gypsum Company (U. S. Gypsum). Although U. S. Gypsum is the sole manufacturer of this product in the United States, the material could be obtained from other suppliers. At the time Gotham entered into the subject agreements with Sal-Vio, Gotham was indebted to U. S. Gypsum, approximately in the sum of $850,000.
In October, 1967, U. S. Gypsum entered into a debt extension agreement with Gotham, which gave U. S. Gypsum a security interest in all of the assets of Gotham. U. S. Gypsuin was then aware of the agreements between Gotham and Sal-Vio. Paragraph 12 of the debt extension agreement, among other things, gave U. S. Gypsum the option to take over the management of Gotham and to sell, liquidate or continue in its own interest the business of Gotham and its affiliate company in the event Gotham failed to make the agreed upon payments on account of Gotham’s indebtedness, or otherwise defaulted under the agreement.
Some time during October, 1967, Gotham commenced delivery of the masonry materials to Sal-Vio. In February, 1968, U. S. Gypsum’s accountants concluded that Gotham could no longer operate a profitable business and that Gotham was losing money under its agreements with Sal-Vio. In March, 1968, exercising its rights under the extension agreement, U. S. Gypsum refused to make further deliveries to Gotham and caused Gotham to stop purchasing other masonry materials from its other suppliers. At that time Gotham owed U. S. Gypsum over $1,000,000. Between April 1 and April 4,1968, Gotham did deliver to Sal-Vio gypsum block and other masonry materials at the agreed price of $10,189.35, sued for in this action. On April 18, 1968, caused to do so by U. S. Gypsum, Gotham assigned for the benefit of creditors. Since Sal-Vio could no longer obtain gypsum block or other masonry materials from Gotham, it purchased such materials from other suppliers at prices higher than those specified in its agreements with Gotham.
It is agreed that Sal-Vio’s excess cost was $24,024.27, for which it counterclaims. If the counterclaim is sustained, the parties have agreed that Sal-Vio is entitled to file a claim against the assigned estate in the sum of $13,855.22, representing the difference between plaintiff’s claim and defendant’s counterclaim.
*731 The agreements between Gotham and Sal-Vio contained the following clause: “No waiver of the Seller’s rights shall be valid unless in writing. The failure of the Seller to make deliveries because of fire, flood, riot, strike, lockout, labor scarcity, car shortage, freight embargo, government regulation, Act of God or the public enemy, legal proceeding, non-arrival or delay of carrier, or for any other cause, whether related or unrelated, or similar or dissimilar to any of the foregoing, over which the Seller has no control, including the failure, refusal or inability of any supplier or manufacturer with whom the Seller may or shall contract for the materials covered by this contract, to manufacture, obtain or deliver the same for any cause whatsoever, shall relieve the Seller from all its obligations under this contract or any modification thereof, or addition thereto, and also from any liability for, or payment of 'damages to the Purchaser caused thereby. In the event that any of said or similar causes shall temporarily delay the Seller in making deliveries, then the time fixed for delivery shall be extended during the period of such delay and the Seller shall have a reasonable time under all the circumstances to make delivery hereunder.”
Plaintiff contends that Gotham’s failure to provide the materials in accordance with the agreements did not constitute a breach of contract because its inability to continue in business and obtain further gypsum block relieved it of any further obligation to supply such materials to Sal-Vio.
Sal-Vio contends that, under their agreements, Gotham agreed to remain in business in order to fulfill its contractual obligations and that Gotham is not excused from performance because of its insolvency or financial difficulties or the unprofitability of the contracts, or the assignment for the benefit of creditors.
Sales contracts, similar to the subject agreements, wherein the seller agrees to furnish and the buyer agrees expressly or impliedly to accept and pay for such quantity of goods as will be required or needed in the operation of the buyer’s business are valid and enforceable. (Edison Elec. Illuminating Co. v. Thacher, 229 N. Y. 172; Ehrenworth v. Stuhmer & Co., 229 N. Y. 210.) However, the rule is otherwise where the quantity of goods to be furnished depends upon the mere wish or whim of either party. (Nassau Supply Co. v. Ice Serv. Co., 252 N. Y. 277; Schlegel Mfg. Co. v. Cooper’s Glue Factory, 231 N. Y. 459.) Unless the agreement or contract, requires performance by each party, ascertainable by a standard of measurement, the agreement is unenforceable for lack of consideration. Here it is not disputed that Gotham was required to supply §ueh masonry *732 materials as the defendant would need for a particular job and period of time. Conversely the defendant was obligated to fulfill its requirements for the job from Gotham, at fixed prices. Under these circumstances, the contracts were valid when made.
However, it does not necessarily follow that there is an express or implied obligation to continue in business. In Du Boff v. Matam Corp. (272 App. Div. 502, 503), relied on by plaintiff, in support of his contention that a party may cease doing business in good faith without incurring liability for breach of contract, the court ¡stated: ‘ ‘ While the cases are not in harmony as to the extent of the obligation entailed in a requirements or output contract, the weight of authority, as expressed in Matter of United Cigar Stores Co. of America (72 F. 2d 673, 675) is that there is no implied obligation to continue in business. The contracting party is left free to do with his business as he may deem best provided,his conduct is bona fide.”
In United Cigar (supra), the buyer agreed to purchase for a period of 10 years all of the ice cream and other frozen products required for its stores. The buyer ceased making purchases and filed a petition of bankruptcy. In disallowing the seller’s claim, the court stated (72 F. 2d 673, 675): “ Since requirements of the buyer may decrease or increase as business conditions fluctuate and be met by the inherent elasticity of a requirements contract, provided the conduct of the buyer is bona fide, there can be no rational distinction between decreases stopping short of total extinction and those which do not.”
The court, in United Cigar, distinguished Wells v. Alexandre (130 N. Y. 642), relied on by defendant here, which enforced a contract for the purchase and «ale of an amount of coal to be measured, not by the requirements of the buyer, but rather by those of certain named steamers owned by the buyer. The buyer’s sale of the steamers was held not to relieve it of its contractual obligations. The fact that the steamers continued to operate was found sufficient to provide a measure for determining the amount of coal the buyer obligated itself to buy.
Defendant’s reliance on 407 East 61st Garage v. Savoy Fifth Ave. Corp. (23 N Y 2d 275) is misplaced. In that action the court noted the conflict between Du Boff v. Matam Corp. (supra), and Wells v. Alexandre (supra) as to whether, “ absent an allegation of bad faith ”, a cause of action for breach of contract is stated against a party to a “ requirements ” contract who goes out of business, and stated (23 F Y 2d 275, 279-280): “ Categorization of the agreement * * * as a ‘ requirements ’ contract * * * in order to determine the obligations of the *733 parties, is only partially helpful. * * * In ultimate analysis, however, an attempt to categorize or ‘ pigeonhole ’ the contract is a circuitous way of answering what is basically ,a simple question of contract interpretation or construction. The real issue in this case is not what kind of contractual relationship is involved, but whether this agreement imports 'an implication that Savoy was obligated to remain in the hotel business, or, better, had undertaken indefeasible obligations for the full term ”.
Here, while Gotham was generally aware of the needs of Sal-Vio to fulfill its commitment to the general contractor to install all of the masonry work for approximately one half of the buildings in Co-op City, it is also true that Sal-Vio knew of the relationship between Gotham and its suppliers. Unlike the Savoy case (supra), the evidence here does not show that Sal-Vio had undertaken any burdens or obligations in the expectation of, or in reliance upon Gotham’s continued activity. For even after Gotham had ceased doing business, defendant was able to secure the materials needed to complete the project. Moreover, the language of the agreements makes it clear that there was no obligation on the part of Gotham to remain in business for the full term of the agreement. Gotham was specifically relieved from liability for failure to make delivery, not only in the event of fire, flood, riot, or other such catastrophe but also “ for any other cause, whether related or unrelated, or similar or dissimilar to any of the foregoing, over which the Seller has no control, including the failure, refusal or inability of any supplier or manufacturer with whom the Seller may or shall contract for the materials covered by this contract, to manufacture, obtain or deliver the same for any cause whatsoever ”.
"Whether the inclusion of this provision in the agreements indicates recognition of the possibility that Gotham’s financial difficulties might preclude it from continuing to supply Sal-Vio does not appear. The provision is broad enough to protect Gotham from liability in the event it was forced, because of inability to obtain supplies to discontinue its operations. Even if it were not the purpose of the clause to excuse nonperformance founded on financial difficulties, it is evident that such language precludes a finding of an express or implied obligation on the part of Gotham to continue in business.
Accordingly plaintiff is entitled to recover the sum of $10,189.35 on its cause of action, together with interest from April 7, 1968, and defendant’s counterclaim is dismissed.